IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DISTRICT

UNITED STATES OF AMERICA
<u>ex</u> <u>rel</u>.                                            *

STEPHEN D. LINCOLN, M.D.                *
7505 Osler Drive
Towson, Maryland  21204                   *        Civil Action No.

and                                                *

PETER HORNEFFER, M.D.                   *
7505 Osler Drive
Towson, Maryland  21204                   *

and                                                *

GARTH McDONALD, M.D.                   *
7505 Osler Drive
Towson, Maryland  21204                   *

        Plaintiff-Relators,                      *

                                                   **CIVIL FALSE CLAIMS ACT**
        v.                                         *    **COMPLAINT FILED UNDER**
                                                       **SEAL PURSUANT TO 31 U.S.C.**
MIDATLANTIC CARDIOVASCULAR      *    **§ 3729, <u>et</u> <u>seq</u>**
ASSOCIATES, P.A.,
1838 Greene Tree Road, Suite 535           *
Baltimore, Maryland, 21208,
                                                   *

<u>Serve on:</u>                                        **DO NOT PLACE IN PRESS BOX.**
James S. Jacobs, Esquire                    *    **DO NOT ENTER IN PACER.**
One South Street
Suite 1910, Commerce Place                *
Baltimore, Maryland  21202
Resident Agent                              *

and                                                *

MARTIN ALBERNOZ, M.D.                  *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                 *

and                                                *

DAVID BERLINER, M.D.                 *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208            *

and                                  *

RICHARD BIGGS, M.D.                  *
1838 Greene Tree Road, Suite 250
Baltimore, MD  21208                 *

and                                  *

JEFFREY BROWN, M.D.                  *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208            *

and                                  *

JEFFREY COLE, M.D.                   *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208            *

and                                  *

CHARLES CUMMINGS, M.D.               *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208            *

and                                  *

MICHAEL DROSSNER, M.D.               *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208            *

and                                  *

BENJAMIN DUBOIS, M.D.                *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208            *

and                                  *

SIDNEY GOTTLIEB, M.D.                *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208            *

and                                             *

THOMAS GUARNIERI, M.D.                           *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                        *

and                                             *

ETHAN HASKEL, M.D.                               *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                        *

and                                             *

RUSSELL HILLSLEY, M.D.                           *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                        *

and                                             *

SCOTT JEROME, D.O.                               *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                        *

and                                             *

KIMBLE JETT, M.D.                                *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                        *

and                                             *

RODNEY JOHNSON, M.D.                             *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                        *

and                                             *

BRIAN KAHN, M.D.                                 *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                        *

and                                             *

ZALMAN KAHN, M.D.                    *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208            *

and                                 *

DREW KIRSHNER, M.D.                  *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208            *

and                                 *

FREDERICK KUHN, M.D.                 *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208            *

and                                 *

JAY LANG, D.O.                       *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208            *

and                                 *

JOHN LASCHINGER, M.D.                *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208            *

and                                 *

STEVE MASON, M.D.                    *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208            *

and                                 *

HENRY MEILMAN, M.D.                  *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208            *

and                                 *

MARK MIDEI, M.D.                     *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208            *

and                                                    *

FRANK MORRIS, M.D.                                     *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                              *

and                                                    *

MARC MUGMON, M.D.                                     *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                              *

and                                                    *

ALEX NA, M.D.                                          *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                              *

and                                                    *

SHELLEE NOLAN, M.D.                                    *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                              *

and                                                    *

DAVID PEICHERT, M.D.                                   *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                              *

and                                                    *

RAYMOND PLACK, M.D.                                    *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                              *

and                                                    *

STEPHEN PLANTHOLT, M.D.                                *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                              *

and                                                    *

STEVEN POLLOCK, M.D.                    *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208               *

and                                     *

JAMES PORTERFIELD, M.D.                 *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208               *

and                                     *

JEFFREY QUARTNER, M.D.                  *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208               *

and                                     *

ROBERT RICKETTS, M.D.                   *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208               *

and                                     *

DAVID RUBIN, M.D.                       *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208               *

and                                     *

JONATHAN SAFREN, M.D.                   *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208               *

and                                     *

JOSEPH SALOMON, M.D.                    *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208               *

and                                     *

DAVID SCHAMP, M.D.                      *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208               *

and                                                  *

JEFFREY SELL, M.D.                                   *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                            *

and                                                  *

PAUL TECKLENBERG, M.D.                               *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                            *

and                                                  *

DEAN VASSAR, M.D.                                    *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                            *

and                                                  *

BARRY WOHL, M.D.                                     *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                            *

and                                                  *

HANK YUROW                                           *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                            *

and                                                  *

ROBERT ZAWODNY, M.D.                                 *
1838 Greene Tree Road, Suite 250
Baltimore, Maryland 21208                            *

and                                                  *

ST. JOSEPH MEDICAL CENTER, INC.                      *
7601 Osler Drive
Towson, Maryland 21204                               *

Serve On:                                            *
The Corporation Trust Incorporated
351 West Camden Street                               *
Baltimore, Maryland  21201

7

Resident Agent                                          *

and                                                    *

THE UNION MEMORIAL HOSPITAL           *
201 E. University Parkway
Baltimore, Maryland  21218                 *

Serve On:                                              *
The Corporation Trust Incorporated
351 West Camden Street                      *
Baltimore, Maryland  21201
Resident Agent                                          *

and                                                    *

SINAI HOSPITAL OF BALTIMORE, INC. *
2410 W. Belvedere Avenue
Baltimore, Maryland  21215                 *

Serve On:                                              *
Joel I. Suldan
2410 W. Belvedere Avenue                   *
Baltimore, Maryland  21215
Resident Agent                                          *

and                                                    *

ST. AGNES HEALTHCARE, INC.              *
d/b/a St. Agnes Hospital
900 Caton Avenue                               *
Baltimore, Maryland  21229
                                                       *

Serve On:
Jeffery M. Pecore                               *
Suite 202W
9123 Old Annapolis Road                     *
Columbia, Maryland  21045
Resident Agent                                          *

and                                                    *

FRANKLIN SQUARE HOSPITAL, INC.        *
9000 Franklin Square Drive
Baltimore, Maryland 21237                  *

Serve On:                                          *
The Corporation Trust Incorporated
351 West Camden Street                             *
Baltimore, Maryland  21201
Resident Agent                                     *

and                                                *

UPPER CHESAPEAKE MEDICAL                           *
CENTER, INC.
d/b/a Upper Chesapeake Medical Center             *
500 Upper Chesapeake Drive
Bel Air, Maryland 21014                            *

Serve On:                                          *
Resagent, Inc.
7 St. Paul Street, Suite 1400                      *
Baltimore, Maryland 21202
Resident Agent                                     *

and                                                *

UPPER CHESAPEAKE HEALTH                            *
SYSTEM, INC.
500 Upper Chesapeake Drive                         *
Bel Air, Maryland 21014
                                                   *

Serve On:                                          *
Resagent, Inc.
7 St. Paul Street, Suite 1400                      *
Baltimore, Maryland 21202                          *
Resident Agent
                                                   *

        Defendants.                                *

*      *      *      *      *      *      *      *      *      *      *      *

## COMPLAINT AND JURY DEMAND

Plaintiff-Relators, by and through their undersigned counsel, bring this qui tam

action in the name of the United States of America and the State of Maryland against the

above named Defendants (hereinafter collectively referred to as "Defendants").

1.      This is an action to recover damages and civil penalties arising from the following activities:

      a.      False statements and claims for reimbursement from the United States Government for federally funded medical care under the Medicare, Medicaid, and Tri-Care programs in violation of the False Claims Act, 31 U.S.C. § 3729 et. seq.

      b.      False statements and claims for reimbursement from the State of Maryland for state-funded medical care in violation of the Maryland False Claims Act, Md. Code Ann., Health General, § 2-602 et seq. (2010).

      c.      Defendants' agreement to offer and to accept remuneration, directly and indirectly, overtly and covertly, to induce the referral of patients to the Defendant hospitals in violation of 42 U.S.C. §§ 1320a-7a and 1320a-7b and 42 U.S.C. § 1395.

      d.      Defendants' attempt to demand remuneration from Plaintiff-Relators to induce Defendants to refer cardiac surgery consults and procedures to Plaintiff-Relators' medical practice in violation of 42 U.S.C. § 1320a-7a and 1320a-7b.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 because this action arises under the laws of the United States.  This Court has pendent jurisdiction over the State False Claims Act claims pursuant to 28 U.S.C. § 3732(a).

3.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a).

4.      Venue is proper in this District because Defendants resided, transacted business, and can be found in this judicial district.

## PARTIES

5.      Plaintiff-Relators were, or are currently, cardiac surgeons licensed to practice medicine in the State of Maryland. At all times relevant to this dispute, Plaintiff-Relators were shareholders in Cardiac Surgery Associates, P.A. ("CSA"), a professional medical corporation organized under Maryland law with its principal place of business at 7505 Osler Drive, Towson, Maryland.  Plaintiff-Relators were associated with various community hospitals in the Baltimore metropolitan region, including St. Joseph Medical Center and Sinai Hospital.  Plaintiff-Relators also had leadership and organizational responsibility for the St. Joseph Medical Center cardiac surgery program, from its inception in or about 1982 through 2000.

6.      Midatlantic Cardiovascular Associates, P.A. ("Midatlantic") is a professional medical association organized under the laws of the State of Maryland, with its principal place of business in Baltimore County, Maryland.  Historically, Midatlantic has been comprised of cardiologists who do not perform cardiac surgery.  Midatlantic, through a series of mergers and acquisitions, has become the dominant cardiology practice in the Baltimore metropolitan area.  On an annual basis, Midatlantic makes over 2,100 referrals for consultations or procedures to independent cardiac surgeons such as CSA.  Midatlantic has pursued a business plan to recruit cardiac surgeons to its cardiology practice for the primary purpose of obtaining the financial benefit of its self-

referrals for cardiac surgery and driving out any remaining competition from independent cardiac surgery practices.

7.      Plaintiff-Relators are the "original source" of the information contained in the complaint within the meaning of 31 U.S.C. § 3730(e) (4) and have personal knowledge of the false records and statements presented to the United States by, or on behalf of, Defendants.

8.      The individually named Defendants were, at relevant times, shareholders and/or employees of Midatlantic.

9.      Defendants St. Joseph Medical Center, Sinai Hospital, and Union Memorial Hospital, are community acute care hospitals possessing certificates of need issued by the State of Maryland authorizing them to perform cardiac surgery and percutaneous coronary intervention in the Metropolitan Baltimore Regional Service Area.

10.     Defendants St. Agnes Hospital, Franklin Square Hospital and Upper Chesapeake Medical Center are community acute care hospitals at which Midatlantic maintains a significant professional presence, and to which Midatlantic refers significant numbers of cardiology patients.

11.     The violations of the False Claims Act arise because Defendants have submitted claims to, and received funds from, the federal and state funded health care programs based on claims, which the Defendants knew were false claims.

## BACKGROUND

12.     To maintain a viable independent cardiac surgery practice, it is necessary that cardiac surgeons receive referrals for surgical consultations or procedures from cardiologists.  At community hospitals, independent cardiac surgeons rely on cardiology

practices for over 99% of all referrals for cardiac surgery.  Traditionally, cardiologists have not sought to utilize their control and influence over cardiac surgery referrals to extract compensation for surgical referrals, and the performance of cardiac surgery has been free of any financial conflict of interest, fee-splitting or improper influence on medical decision making.

13.     Under the compensation or reimbursement programs for state, federal, and/or private health care programs, surgeons are generally compensated at a higher rate than non-surgeon physicians.  It has been long recognized that surgeons go through a longer training period and have highly specialized surgical skills that are not duplicated in the general physician population.  This distinction exists in cardiac care practice where cardiologists are not qualified to perform cardiac surgery.  In most reimbursement plans (Medicare, Medicaid and private), a cardiac surgeon is reimbursed for surgical fees at a higher amount than a cardiologist may be reimbursed for an office visit, cardiac catheterization or cardiac management.  Though reimbursed at a higher rate, cardiac surgeons have a shorter career duration than cardiologists due to the intensity and complexity of surgical practice.

14.     Throughout the 1990's Midatlantic, its officers, shareholders, and employees engaged in what ultimately became an illegal two-pronged business plan to control the market for cardiology services and procedures in the Baltimore, Maryland region.

15.     In the first prong, Midatlantic initiated a series of mergers and acquisitions with competing cardiology practices in order become, by far, the largest cardiology practice in the state of Maryland.  By the early 1990's, Midatlantic met its goal, and it

controlled an overwhelming market share of the practice of cardiology in the Baltimore, Maryland region.  The sole purpose of their growth was to secure dominant negotiating leverage with hospitals and managed care networks.  Midatlantic's leverage is its patient referral, and this referral leverage has grown to an unprecedented level.  Through its referral leverage, Midatlantic forced the hospitals named herein to grant unfettered authority to bill for procedures such as cardiac stents.

16.     The second prong of Midatlantic's illegal business plan centered on a plan by Midatlantic to capture a portion of the surgical fees associated with its cardiac surgery referrals.  By the late 1990's, Midatlantic's management, acting through its agent and CEO Hank Yurow, recognized that Midatlantic referred approximately $10 million in business to cardiac surgeons. Viewing these referrals as a potential revenue stream that could be redistributed to Midatlantic's partners, Midatlantic devised a scheme to capture a portion of that revenue by incorporating cardiac surgeons into the Midatlantic medical practice.

17.     Midatlantic first attempted to initiate the second prong of its business plan by merging its practice with Cardiac Surgery Associates.

18.     In or about early 1998, Hank Yurow and various Midatlantic Board members contacted Dr. Garth McDonald of Cardiac Surgery Associates to discuss merging the two practices.

19.     In the initial merger discussions, Mr. Yurow and other Midatlantic representatives informed CSA's representatives that CSA could anticipate losing virtually all of its cardiac surgery referrals if it did not merge with Midatlantic.  Midatlantic threatened to hire its own cardiac surgeons and refer all surgical procedures and

consultations exclusively to those surgeons.   Mr. Yurow, as agent of Midatlantic, stated, however, that Cardiac Surgery Associates could avoid losing referrals from Midatlantic if it agreed to merge its practice with Midatlantic's cardiology practice.

20.     From the outset of the merger talks, it became abundantly clear to the representatives of Cardiac Surgery Associates that Midatlantic sought to structure the purported merger with CSA in such a way that Midatlantic's cardiologists would receive illegal kickbacks from CSA for referring surgical procedures and consults to the CSA surgeons.  To this end, Mr. Yurow informed CSA surgeons that, as part of the merger, CSA's surgeons would be charged a one time $800,000 assessment to cover fictitious "overhead costs."   This $800,000 "overhead" assessment would then be redistributed to Midatlantic's cardiologists in the form of additional salary.

21.     During the early merger negotiations, Midatlantic, through its CEO, Hank Yurow, and selected Board members, made numerous threats to CSA, advising that the CSA surgeons would face professional extinction if they declined to merge with Midatlantic.  Dr. Steven Pollock, a member of Midatlantic's Board of Directors, advised CSA physicians that he would no longer make surgical referrals to cardiac surgeons with whom he "did not have a business relationship."   On frequent occasions, Mr. Yurow expressed the view that cardiologists should be able to make money from surgery referrals and that surgeons should not keep the entire monetary benefit of a cardiologist's referral.  He expressed an intent to make all surgery referrals, with the possible exception of transplant and pediatric cases (traditionally referred to Hopkins surgeons), to newly employed Midatlantic cardiac surgeons.

22.     The Baltimore-based community hospitals with open-heart surgery programs, Sinai Hospital, St. Joseph Medical Center, and Union Memorial Hospital, are heavily dependent upon cardiology (including cardiac surgery) referrals for their financial survival.  These admissions generate a highly disproportionate percentage of each hospital's total revenues.  Accordingly, at all relevant times, Midatlantic has held and exercised power over each of these hospitals by threatening, either explicitly or implicitly, to move its patients to other hospitals if the hospital does not accede to Midatlantic demands.  Throughout the course of Midatlantic's merger negotiations with CSA, Mr. Yurow frequently boasted of Midatlantic's referral power over the community hospitals and made it clear that he had in the past, and would in the future, use such referral leverage to force the hospitals to accommodate Midatlantic's demands.

23.     CSA rejected Midatlantic's merger offer, and negotiations between CSA and Midatlantic ceased in late 1999.

24.     After the cessation of merger negotiations, in late 1999 through early 2000, Midatlantic and its officers, shareholders, and employees began a process of actively recruiting cardiac surgeons to join Midatlantic's practice.  Sometime in early 2000 Midatlantic identified several potential surgeons who would accept employment by Midatlantic and serve as Midatlantic's sole referral sources.

25.     After identifying surgeons to join Midatlantic's practice, Midatlantic, through its agent and CEO Hank Yurow, again approached CSA in early 2000 to revive merger discussions.  In these discussions, Midatlantic's agent and representative, Mr. Yurow, stated that the terms of the proposed merger had changed.  Midatlantic represented that its leverage over CSA was greater because Midatlantic had identified

potential surgeons to hire as partners in Midatlantic.  Mr. Yurow represented that Midatlantic anticipated hiring these surgeons and would then refer all surgical procedures to them unless CSA agreed to Midatlantic's merger terms.

26.     As part of the merger, Midatlantic demanded that each individual CSA surgeon submit to an annual $500,000 reduction in earnings, which would be re-distributed to the Midatlantic cardiologists.  Mr. Yurow stated words to the effect that the $500,000 per surgeon "overhead assessment" was a "pound of flesh" that would compensate Midatlantic for CSA's rejection of the previous merger terms proposed by Midatlantic in 1998.

27.     In 2000 CSA rejected Midatlantic's merger terms.

28.     After CSA rejected Midatlantic's terms, Midatlantic followed through on its threats to put CSA out of business.  Midatlantic hired CSA surgeon John Laschinger, M.D. in July 2000.

29.     Dr. Laschinger represented to the Plaintiff-Relators at CSA that he was moving to Midatlantic in order to avoid the "death spiral" that he believed would result from CSA's rejection of Midatlantic's offer to merge practices.

30.     Later in 2000, Midatlantic hired five additional cardiac surgeons, all of whom were unknown in the state of Maryland, and used its referral leverage to induce their accreditation by St. Joseph Medical Center, Sinai Hospital and Union Memorial Hospital.

31.     After hiring surgeons in July 2000, Midatlantic followed through on its threat to stop referring surgical cases to CSA.  Starting in July 2000 and continuing up

through the present, Midatlantic's cardiologists stopped referring cases to CSA. As a result, CSA experienced a 100% decline in referrals from Midatlantic's cardiologists.

32.     Starting in July 2000, and continuing up through the present, Midatlantic also engaged in a scheme designed to inflate its own revenues through self-referral of cardiac patients, at the expense of patient welfare and treatment.  Under this scheme, Midatlantic referred patients to cardiac surgeons employed by Midatlantic without revealing to those patients that Midatlantic had a financial relationship with the surgeons and stood to gain additional fees if the patients received surgical treatment from their recommended surgeons.

33.     Since July 2000, Midatlantic has engaged in a series of unfair and anti-competitive practices that have further damaged CSA's cardiac surgery practice.  Several of Midatlantic's physicians have misdirected patients from CSA to Midatlantic's employee surgeons by misinforming the patients or their family members that CSA surgeons were retired or otherwise unavailable.

34.     Since July 2000, Midatlantic used its referral leverage to induce St. Joseph Medical Center administrators to ignore and/or fail to investigate multiple acts of patient deception of which they were fully aware.

35.     Since July 2000, Midatlantic used its referral leverage to induce St. Joseph Medical Center administrators to actively aid and abet Midatlantic's efforts to deceive patients regarding the availability of the CSA surgeons.  By way of example, St. Joseph Medical Center refused to permit CSA to place professional brochures informing potential cardiac patients of their presence at the hospital in the cardiac catheterization lab.

36.     Since July 2000, Midatlantic used its referral leverage to induce St. Joseph Medical Center administrators to abrogate, abandon and/or otherwise degrade its Quality Assurance and Peer Review procedures, to the extreme detriment of patient care, especially in the cardiac surgery program and the cardiac catheterization lab.

37.     Since July 2000, at every hospital where it has maintained a significant professional presence and contributed significant cardiology referrals, Midatlantic has used its referral leverage to pressure hospital administrators to accommodate improper, unlawful Midatlantic demands, including demands for "kickbacks" for its cardiology referrals. By way of example, Midatlantic used its referral leverage to force St. Joseph Medical Center to provide kickbacks disguised as "managed care guidance" and "outcomes data" research.  These payments ostensibly are made to Midatlantic to assist St. Joseph Medical Center in streamlining operations in order to better maximize reimbursement from managed care organizations.  Similarly, the "outcomes data" research was ostensibly research that would provide evidence of positive outcomes arising from inpatient therapies and treatments delivered hospital wide.  These payments, however, were shams, because Midatlantic was a cardiology practice, and not in the managed care business, nor did it possess expertise in outcomes based research.

## <u>COUNT ONE</u>
### (Violation of the Self-Referral and Anti-Kickback Laws)

38.     Plaintiff-Relators incorporate the foregoing paragraphs as if fully set forth herein.

39.     By virtue of the acts described herein, Defendants have knowingly submitted, or caused to be submitted, false or fraudulent claims for payment to officials of the United States Government and the State of Maryland in violation of the Federal

False Claims Act, 31 U.S.C. § 3729 et seq., and the State of Maryland's False Claims Act, Md. Code Ann. (Health General) § 2-601 et. seq., by knowingly and willfully soliciting remuneration, directly and indirectly, overtly and covertly, in cash and in kind, from Plaintiff-Relators in order to induce Defendants to refer cardiac surgery procedures and consults to Plaintiff-Relators, for which payments for such surgeries and consults were made in whole and in part under state and federal health care program, all in violation of 42 U.S.C. § 1320a-7a(a)(7) and 1320a-7b(1)(A),

40.     Plaintiff the United States, and the State of Maryland, unaware of the foregoing circumstances and conduct of Defendant, and in reliance on the accuracy of said false or fraudulent claims, made payments to Defendants, which resulted in the United States and the State of Maryland being damaged in an amount to be established at trial or upon motion.

## COUNT TWO
### (31 U.S.C. § 3729 (a) (1) False Claims Act)
### (Knowingly Presenting a False or Fraudulent Claim)

41.     Plaintiff-Relators incorporate the foregoing paragraphs as if fully set forth herein.

42.     By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval.

43.     Defendants knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.  These claims were,

therefore, false or fraudulent claims submitted for payment or approval to the United

States in violation of 31 U.S.C. Section 3729(a) (1).

44.      Plaintiff, the United States, unaware of the foregoing circumstances and

conduct of Defendants, and in reliance on the accuracy of said false or fraudulent claims,

made payments to Defendants, which resulted in the United States being damaged in an

amount to be established at trial or upon motion.

## COUNT THREE
### (31 U.S.C. Sec. 3729 (a) (1) False Claims Act)
### (Knowingly Making, Using, or Causing to be Made or Used, a
### False Record or Statement)

45.      Plaintiff-Relators incorporate by reference the preceding paragraphs as if

fully set forth herein.

46.      By virtue of the acts described above, Defendants made, used, or caused to

be made or used, false records and statements to get the false and fraudulent claims

allowed and paid.

47.      The United States, unaware of the foregoing circumstances and conduct of

Defendants, and unaware of the falsity of the records and or statements made, used, or

caused to be made or used by Defendants, and in reliance on the accuracy thereof, paid

the false or fraudulent claims submitted it, which resulted in the United States being

damaged in an amount to be established at trial or upon motion.

## COUNT FOUR
### (31 U.S.C. Section 3729(a) (3) and Md. Code Ann., Health General,  § 2-602(a)(3))
### (Knowingly Engaging In a Conspiracy In Violation
### of the False Claims Act)

48.      Plaintiff-Relators incorporate the foregoing paragraphs as if fully set forth

herein.

49.     As a result of their illegal business and financial arrangements, and illegal conduct, Defendants conspired to obtain payments wrongfully from the United States in violation of 31 U.S.C. Section 3729(a)(3) and Md. Code Ann., Health General, § 2-603(a)(3).

50.     As a consequence of this illegal conspiracy, the United States and the State of Maryland have suffered substantial damages in an amount to be determined at trial or upon motion.

### COUNT FIVE
### (Md. Code Ann. (Health General) § 2-602 Maryland False Claims Act)
### Knowingly Presenting a False Claim

51.     Plaintiff-Realtors incorporate the foregoing paragraphs as if fully set forth herein.

52.     The Maryland False Claims Act, Md. Code Ann. (Health-General) § 2-602(A) (1) (2010), prohibits knowingly presenting or causing to be presented false or fraudulent claims for approval.

53.      By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to officers, employees, or agents of the State of Maryland false or fraudulent claims for payment or approval.

54.     Defendants knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of said claims or acted in reckless disregard of whether said claims were true or false.  These claims were, therefore, false or fraudulent claims submitted for payment or approval to the State of Maryland in violation of the Maryland False Claims Act, Md. Code Ann. (Health-General) § 2-602(A)(1) (2010),

55.     The State of Maryland, unaware of the foregoing circumstances and conduct of Defendant, and in reliance on the accuracy of said false or fraudulent claims, made payments to Defendant, which resulted in the State of Maryland being damaged in an amount to be established at trial or upon motion.

## COUNT SIX
### (Md. Code Ann. (Health General) § 2-602(A)(2) Maryland False Claims Act)
### (Knowingly Making, Using or causing to be made or used a
### False Record or Statement)

56.     Plaintiff- Realtors incorporate the foregoing paragraphs as if fully set forth herein.

57.     The Maryland False Claims Act, Md. Code Ann. (Health-General) § 2-602(A)(2) (2010), prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

58.     By virtue of the acts described above, Defendants made, used or caused to be made or used, false records and statements to get the false and fraudulent claims allowed and paid.

59.     Defendants knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of said claims or acted in reckless disregard of whether said claims were true or false.  These claims were, therefore, false or fraudulent claims submitted for payment or approval to the State of Maryland in violation of the Maryland False Claims Act, Md. Code Ann. (Health-General) § 2-602(A)(1) (2010),

60.     The State of Maryland, unaware of the foregoing circumstances and conduct of Defendant, and in reliance on the accuracy of said false or fraudulent claims,

made payments to Defendant, which resulted in the State of Maryland being damaged in an amount to be established at trial or upon motion.

**WHEREFORE**, Plaintiff-Relators, on behalf of themselves, the United States of America, and the State of Maryland, demand judgment against Defendants as follows:

A.  All Counts:

    (a)    Treble the amount of damages sustained by the United States, in an amount to be established at trial equal to the amount of false claims submitted by Defendant;

    (b)    Assessment of a civil penalty of $10,000 for each false or fraudulent claim that Defendant made or caused to be made to the government;

    (c)    All other necessary and proper relief, including the costs of this action.

In addition, Plaintiff-Relators on their behalf further demand:

    (a)    That, in the event that the United States of America or the State of Maryland proceed with this action or otherwise settles these claims, the Court award to Plaintiff-Relators, an amount of the proceeds of this action or settlement of these claims of not less than 15% and as much as 25% pursuant to 31 U.S.C. § 3730(d) and Md. Code Ann., Health General, § 2-605(A)(I), together with an amount of reasonable expenses incurred by Plaintiff-Relators, plus reasonable attorneys' fees and all costs and expenses incurred by the Plaintiff-Relators in bringing this action.

(b)     That in the event that the United States of America does not

proceed with this action, the Court award to Plaintiff-Relators, an

amount of the proceeds of this action or settlement of claims of not

less than 25% and as much as 30% pursuant to 31 U.S.C. 3730

(together with an amount of reasonable expenses incurred by

Plaintiff-Relators, plus reasonable attorneys' fees and all costs and

expenses incurred by the Plaintiff-Relators in bringing this action.

(c)     Such other and further relief that this Court deems just and proper.

## Jury Demand

Pursuant to Fed. R. Civ. P. 38, Plaintiff-Relators demand trial by jury.

Dated: June 18, 2010.

William F. Gately
Howell & Gately
1108 Cowpens Avenue
Towson, MD  21286
Ph: 410-583-7514

J. Stephen Simms (4269)
W. Charles Bailey, Jr.  (23580)
Simms Showers LLP
20 S. Charles Street
Suite 702
Baltimore, Maryland 21201
Phone:  410-783-5795